UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| A.A., by his mother and next friend REEM ODEH, et al., | |
| Plaintiffs, | No. 17 CV 1543 |
| v. | Judge Manish S. Shah |
| VILLAGE OF ORLAND HILLS, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Orland Hills Police Officers Scully and Miller were out on routine patrol one February evening when they happened across two young men sitting in a parked car in a high-crime area. They stopped to surveil from a distance. When one of the young men made a gesture toward his waistband, the officers pulled closer, boxing the parked car in its spot. The officers said they observed marijuana residue as they walked up to the car but, after checking the young men's identification, patting them down and searching the car, found no further evidence of criminal activity, made no arrests, took no photos, collected no samples, nor otherwise did anything to document the marijuana residue. The young men, minors A.A. and D.M., bring this action against officer Scully and the Village of Orland Hills alleging an unconstitutional search and seizure and a false-arrest claim. The defendants move for summary judgment as to all counts.

I. **Legal Standards**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Determinations of probable cause and reasonable suspicion are normally mixed questions of law and fact." *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010); *see also Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (summary judgment on probable cause is appropriate "where there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them").

II. **Facts**

Early one winter evening, two young men headed out to play a game of basketball. [37] ¶ 4; [31-1] at 19:11–18; [31-2] at 17:20–21.[1] They needed a ball, so

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiffs' responses to defendants' Local Rule 56.1 statement, [37], and the defendants' responses to plaintiffs' additional statement, [39], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments in their statements, included additional facts in their responses or replies, or failed to cite to supporting material in the record, I disregarded those portions of those statements, responses, or replies. *See* LR 56.1(b)(3)(C) (facts are deemed admitted if not properly controverted).

D.M. (age seventeen, the driver) picked up A.A. (age fifteen, the passenger) and together they drove to pick one up from a mutual friend that lived at a nearby apartment complex. [37] ¶ 1–2, 4; [31-1] at 21:4–11; [31-2] at 19:9–10; 21:21–24. It was dark by the time their Volkswagen GTI pulled into an empty space outside of the complex. [39] ¶ 1; [31-2] at 70:17–20; 21:8–10; [31-1] at 35:2. The Volkswagen was illuminated by streetlight, [37] ¶ 10, and the driver kept the lights on. [37] ¶ 7. There were other cars in the parking lot, *see* [39] ¶ 2; [31-2] at 23:15–20 ("the lot was full"); [31-4] at 15:19–21 (estimating there were fifty cars in the lot), but only one—the Volkswagen—was running. [37] ¶ 7.

The car attracted the attention of two officers driving down the street in an unmarked Crown Victoria. [37] ¶ 6; [31-4] at 36:7–11; [31-3] at 6:24–7:1; 8:2–11; 8:20–23. They decided to investigate. Officer Miller turned the Crown Victoria into the parking lot and brought it to a stop about fifty feet down the lane that ran behind the Volkswagen (such that either of the plaintiffs, sitting in the parked Volkswagen, would have had to glance over their shoulders to see the Crown Victoria, and such that the driver could have still pulled the Volkswagen out of the space and driven away). [37] ¶¶ 6, 9; [31–4] at 16:16–19:12; 38:1–10; [31-3] at 8:18–23; 11:5–6.

The officers considered the Volkswagen suspicious because (1) it was parked next to an apartment complex where a "significant amount of drug and property crime" occurred, [37] ¶ 8; [31-4] at 21:24–22:8; [31-3] at 9:22–10:8 (Officer Miller testifying that the "majority of our calls for service originate at that apartment

3

complex. Calls for robberies. We've had shootings there, narcotics activity"); (2) the lights were on, (3) it was occupied and (4) Officer Scully believed it was the only car in the lot running. [37] ¶ 7. Officer Miller testified that, at this point, neither officer was aware of any other facts that made them believe the occupants were (or were going to become) involved in criminal activity. [31-3] at 10:15–11:1.

From this vantage point, the officers sat and watched for a few minutes. [37] ¶ 11; [31-4] at 14:11–16; 21:1–7; [31-3] at 11:20–22; 13:3–6. They were wearing plain clothes and vests that said "police" on them. [37] ¶ 14. Seated in the Crown Victoria, the officers were roughly eye-level with the Volkswagen, [39] ¶ 13, which was parked nearby in the middle of a row of about twenty-five or thirty spaces. [37] ¶ 9. Officer Miller testified that there was a "direct line of sight" between the officers and the young men, [31-3] at 11:16–19, but Officer Scully acknowledged the possibility that a third car was at least partially blocking their view. [39] ¶ 7.

After a few minutes, the passenger made a movement toward his sweatpants. Officer Scully thought it looked like the passenger was "sticking something inside of his sweatpants." [37] ¶ 12; [31-4] at 22:22–23:3. *But see* [31-4] at 26:12–14 (admitting that Officer Scully could not see that the passenger was wearing sweatpants). Officer Miller thought it looked like the passenger was "digging around in his waist area" to hide something. [37] ¶ 13; [31-3] at 13:21–14:20. *See also* [31-3] at 11:16–19 (calling the movements "furtive"). *But see* [31-3] at 14:11–23 (admitting he could not "actually see him digging around" and that he could not see

4

anything in the passenger's hands). A.A. said that he was adjusting his basketball shorts (which he was wearing underneath his sweatpants). [31-1] at 48:14–22.

At some point the young men noticed the officers and identified them as such. Both Officers Scully and Miller testified that it appeared as if the passenger "look[ed] back" at their vehicle before reaching for his sweatpants. [31-4] at 22:24–23:14; 26:6–8; [31-3] at 12:2–4. The driver, D.M., did not notice any police vehicles in the parking lot when they arrived, [31-2] at 23:21–23, but later noticed an "unmarked vehicle" in his rearview mirror and identified it as such in part because it had a "spotlight on the passenger and driver's side." [31-2] at 24:15–25:19. After noticing the unmarked vehicle, the driver asked the passenger, "is there anyone behind my car wearing uniforms?" [31-2] at 27:3–4. According to the driver, the passenger said, "No, I can't see anyone." [31-2] at 27:6. The passenger formed the opinion that the men were officers "as [they were] approaching" the Volkswagen. [31-1] at 28:23–29:2.

Satisfied that something was up, the officers initiated an encounter. Officer Miller pulled the Crown Victoria forward until it was directly behind the Volkswagen. [37] ¶ 14. With the cars in this position, the Volkswagen could not pull forward without running out of the parking lot, *see* [37] ¶ 9; [31-4] at 29:3–5, and could not pull backward without hitting the Crown Victoria. [39] ¶ 8; [31-4] at 28:24–29:2; [31-3] at 15:13. Both Officer Scully and Officer Miller got out of their car and approached the Volkswagen. [37] ¶ 14. Both carried lit flashlights. *Id.*

Both officers testified that they observed "shake" (small pieces of marijuana leaves) on the passenger's lap and on the floorboard as they approached. [37] ¶ 15; [31-4] at 30:22–31:5; [31-3] at 15:17–16:10; 17:6–20. Neither officer collected or photographed the shake, [39] ¶ 26, Officer Miller testified that he undertook no effort to collect the shake, [31-3] at 21:17–19, and Officer Scully testified that the reason he did not document the shake was that "the size were so minute, it didn't seem reasonable to collect evidence because we didn't plan on charging them with the crumbs alone." [31-4] at 33:11–13. Throughout the encounter, neither officer reported smelling marijuana or having any other reason to believe that either occupant was under the influence of marijuana (or any other drug). [39] ¶ 22. Both plaintiffs testified that there was no marijuana in the car. [39] ¶ 29.

When they reached the Volkswagen, the officers checked the occupants' identification, [37] ¶¶ 29, 32; [34-1] at 47:3–5 (the passenger provided a student I.D. instead of a driver's license) and performed a pat-down search. [37] ¶¶ 17–19; [31-4] at 39:17–40:3; 40:23–41:7; 43:20–44:23; 66:9–11; [31-3] at 18:23–19:7. Then, the

6

young men stood nearby and watched as Officer Miller searched the Volkswagen for about two minutes. [37] ¶ 21. The officers found no evidence of criminal activity. [39] ¶ 28; [31-4] at 33:14–17; [31-3] at 21:13–16.

There is conflicting testimony about whether consent to perform the search was refused, never indicated, affirmatively stated before the search began, or implied through gesture as the search was unfolding. In the first account, the driver testified that he told Officer Miller that he did not consent to any searches and that, in response, Officer Miller[2] said that he did not need the driver's consent. [31-2] at 43:24–44:2; [31-1] at 55:9–15. In the second account, the passenger corroborated the driver's account and added that, before the search, the passenger told Officer Scully that both officers could "go ahead and search the car all you want." [37] ¶ 36; [31-1] at 54:11–55:15. And in the third, Officer Scully testified that neither young man said anything about consenting (or not consenting) to the search, [37] ¶ 22; [31-4] at 57:16–58:8, and that neither he nor Officer Miller said anything about needing (or not needing) consent to search the car. [31-4] at 57:21–23. Consent never came up during Officer Miller's deposition.

Officer Miller began to search the car. He ran into trouble with the center console because it was "broken" and the driver had previously "taped it shut." [31-2] at 56:15–57:3; [31-1] at 55:23–24. When the driver noticed and asked if Officer Miller needed help, Officer Miller "called [him] in the vehicle," and the driver

---

[2] The driver attributed this statement to the officer that patted him down. [31-2] 43:22–23. Officer Miller performed the pat-down search on the driver. [37] ¶ 18.

7

"untaped it." [31-2] at 57:2; 57:12–14; [31-1] at 57:7–18. Officer Miller then continued the search. [31-1] at 58:11–14.

The officers testified that the entire stop took between five and ten minutes. [37] ¶ 25. Neither young man was charged with any crime. [37] ¶ 44.

## III. Analysis

### A. The Fourth Amendment

Increasing levels of suspicion are needed to justify increasingly invasive and protracted searches. *United States v. Burton*, 441 F.3d 509, 512 (7th Cir. 2006). In broad strokes: "a 'stop' without limiting the suspect's freedom requires no suspicion; a brief detention calls for reasonable suspicion; an arrest requires probable cause; invasive techniques such as surgery require more." *Id.*

  *1. Parking the Crown Victoria Near, but not Immediately Behind, the Volkswagen*

The officers started out at the non-intrusive side of the continuum. At that end, officers are free to restrain individuals in limited ways without any reason to suspect they have committed a crime. For instance, the police need no reason for being suspicious before questioning bystanders, *Burton*, 441 F.3d at 512 ("no suspicion at all is required" where the "curtailment of the bystander's mobility, privacy, and peace of mind" is "so slight"), "look[ing] through the windows of a car parked in a public place," *United States v. Thornton*, 463 F.3d 693, 698–99 (7th Cir. 2006), or even parking police cars both in front of and beside an individual's car (so long as the individual is still free to pull backwards and drive away). *See United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986).

8

The officers did not curtail anyone's mobility—at least at first. When the Crown Victoria initially came to a stop, it was still fifty feet behind the Volkswagen, leaving the young men plenty of space to drive away. [37] ¶¶ 6, 9; [31–4] at 16:16–19:12; 38:1–10; [31-3] at 8:18–23; 11:5–6. What the officers knew or did not know, and whether it reasonably or unreasonably supported a suspicion, did not yet matter.

### 2. *Blocking the Volkswagen*

Then, the officers pulled their Crown Victoria forward. A person is "seized" within the meaning of the Fourth Amendment if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988). The test accounts for the individual's age. *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) (where the person being seized is a child, the question is whether a "reasonable child would have believed that he was free to leave"). The police can use objects to help them "seize" an individual and, often, they use their cars. *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994); *see also Burton*, 441 F.3d at 511 (police bicycles surrounding a car was a seizure).

The police used the Crown Victoria to box the Volkswagen into the parking space. Officer Miller testified that he pulled the Crown Victoria "up behind their vehicle" so that "they couldn't leave." [31-3] at 15:4–13. Officer Scully testified that the Volkswagen "could no longer back out of the parking space" and also could not "have gone forwards out of the parking space." [31-4] at 28:24–29:5. *See also* [31-4]

9

at 29:6–7 ("Q. So they were no longer free to go; right? A. Correct"). There is no genuine dispute about this: everyone agrees the Volkswagen could not depart once the Crown Victoria was parked behind it.

By that point, then, the officers had seized the plaintiffs.

### 3. Factual Disputes Over Reasonable Suspicion

Seizure requires justification. Officers may conduct a "brief detention," or "*Terry* stop" when they have "reasonable suspicion" that the individual "has or is about to commit a crime." *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009); *Terry v. Ohio*, 392 U.S. 1, 20 (1968). A suspicion is "reasonable" if the officer is "'able to point to specific and articulable facts' that give rise" to that suspicion. *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). The threshold is "lower . . . than probable cause" and "does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 412 (1981). It requires "more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quotations omitted). And the amount of suspicion necessary is relative; the "less protracted and intrusive a search is, the less suspicion the police need . . . and vice versa." *Burton*, 441 F.3d at 511; *Terry*, 392 U.S. at 20.

The test is objective. It considers the facts "available to the officer at the moment of the seizure or the search" and asks whether those facts would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (quotations omitted). It takes into account the "totality of the circumstances known to the officer at the

time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). The stop must be "justified at its inception." *United States v. Green*, 111 F.3d 515, 519 (7th Cir. 1997).

Location is important but not determinative. "[T]he fact that the stop occurred in a 'high crime area'" is "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). But "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.*

Similarly, "[f]urtive movements" are part of the relevant contextual analysis—but they are most often (if not only) important when the person making the furtive movement is aware that police are nearby. *See United States v. Evans*, 994 F.2d 317, 321 (7th Cir. 1993) (*after* the officers had activated their lights and sirens to pull the car over, the car's occupants were observed "lean[ing] forward at a forty-five degree angle for several seconds, as to place or retrieve something under the seat"); *United States v. Nash*, 876 F.2d 1359, 1360 (7th Cir. 1989) (a defendant who "appeared to raise himself up from the car seat and beg[i]n reaching towards the floor" after seeing a police car behind him had made a "furtive gesture" justifying a search of his car); *United States v. Denney*, 771 F.2d 318, 319–322 (7th Cir. 1985) (after "Special Agent Thomas Chown *identified himself as such and, with his gun drawn*, ordered the driver to raise his hands and to exit the truck," the

11

defendant's "furtive gestures" in "moving or leaning toward the right side of the truck" were consistent with the movements of someone "reaching for a weapon") (emphasis added).[3]

"Furtive movements," the thinking goes, suggest an effort to either hide or retrieve something that supports an inference of criminal activity (e.g., contraband or a gun). But without the police to provide motivation, the movement's connection to criminal or dangerous activity is less clear. As a result, furtive movements carry less weight in the reasonable suspicion analysis when the persons making them are unaware of police.

The officers point to five facts that they say justified a reasonable suspicion. First, the young men were in an area that the officers knew to be "high crime." [37] ¶ 8; [31-4] at 21:24–22:8; [31-3] at 9:22–10:8. Second, the passenger made a "furtive movement" towards his sweatpants. [37] ¶¶ 12–13; [31-4] at 22:22–23:3; [31-3] at 13:21–14:20; 11:16–19. *But see* [31-4] at 26:12–14. Third, the Volkswagen was running, fourth, its lights were on, and fifth, it was occupied. [37] ¶ 7.

As to the first, the officers may be right. The test is not whether the apartment complex was in fact in a "high crime" area; the test is whether a reasonable officer, knowing what Officers Miller and Scully knew, would consider the apartment complex to be in a "high crime" area. *Bullock*, 632 F.3d at 1012,

---

[3] Even when the person is aware of the police, commentators have cautioned courts against assuming that the suspect was trying to "hide something," especially when the officers do not know what that "something" is. § 3.6(d) Furtive gestures, 2 Search & Seizure § 3.6(d) (5th ed.) (noting that officers should not assume "that the movements in question were purposely responses to the officer's appearance on the scene," nor that "only the guilty will react in the described manner," especially considering that "such movements might be for the purpose of obtaining a driver's license or registration card").

12

*Lawshea*, 461 F.3d at 859. Their testimony shows that they were aware of facts supporting that conclusion: Officer Miller, for instance, testified that the "majority of [their] calls for service originate" from that apartment complex alone. [31-3] at 9:22–10:8. The first fact the officers rely upon supports a reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. at 124. But they need more. *Id.*

If they had more, they struggle to point to it. A non-suspicious inference could be drawn from the "furtive movement" towards the sweatpants. First, there remains a genuine dispute as to whether the passenger knew the officers were nearby when he made that movement. The officers say the occupants looked back before making the movement, [31-4] at 22:24–23:14; 25:24–26:5; [31-3] at 12:2–4, but the young men say they did not notice the officers until later, [31-2] at 23:21–23; 24:15–25:19, possibly after the officers got out of their car. [31-1] at 28:23–29:1. If the passenger did not know the officers were there, or if the officers' assertions to the contrary are not credible (because, perhaps, it was dark out, [39] ¶ 1, or because there might have been a car in the way, [39] ¶ 7; [31-4] at 18:15–18; 19:16–19, or because the officer could not see the passenger's lower half, [31-3] at 14:11–23), then a reasonable jury could conclude that the gesture was not suspicious. With the dispute over the timing and suspiciousness of the gesture, the other facts (that (1) the Volkswagen was running, (2) its lights were on, and (3) it was occupied) do not combine as a matter of law to justify a *Terry* stop. A jury could conclude that an officer who did not see a suspicious gesture had no constitutional reason to detain two young men waiting in a running car in a high crime area. There are many non-

13

criminal things that can be waited for in a running car. One is a basketball. Defendants point to no authority that justifies detention and investigation of every person sitting in a running car in this apartment complex parking lot, without some added suspicious activity.

### 4. *The Marijuana Residue*

Next, the officers say they saw marijuana residue—but not until they got out of the Crown Victoria and approached the Volkswagen. [37] ¶ 15; [31-4] at 30:22–31:8; [31-3] at 15:17–16:10; 17:6–20. Both Officer Miller and Officer Scully testified that they noticed "shake" on the passenger's lap and the floorboards as they walked to the car's side. [37] ¶ 15. There was no other evidence presented to support the conclusion that the young men possessed marijuana. [39] ¶¶ 22, 28; [31-4] at 33:14–17; [31-3] at 21:13–16.

A jury could find that the officers are not credible and that there was no marijuana. First, both young men testified that they did not possess marijuana. [39] ¶ 29; [31-2] at 102:2–3. The passenger's mother corroborated his testimony. [36-1] ¶ 19. And the results of their search provided no evidence to corroborate the officers' assertions. [39] ¶ 28; [31-4] at 33:14–17; [31-3] at 21:13–16. Second, neither officer collected any of the marijuana residue. [39] ¶ 26; [31-3] at 21:17–19. They took no photos, either. *Id.* Officer Miller testified that he undertook no additional efforts to preserve the marijuana residue. [31-3] at 21:17–19. Whether one believes the reason they gave for not collecting it at all (it was so small that they did not want to bother charging the young men for a possession violation, [37] ¶ 16), or whether one believes them that it was there in the first place, or whether one believes this was

all pretextual justification, depends on the officers' credibility. Their credibility is a question of fact, *see United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010); *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007), meaning there remains a genuine dispute as to whether they had sufficient information available to them at the time they conducted the I.D. check, pat-down and search.[4]

### 5. *The I.D. Check and Pat-Down*

If the officers did not have a reasonable suspicion of the young men before seizing them, and if they did not uncover additional suspicious facts (the marijuana) in the ensuing moments, then there remains a genuine dispute as to whether the officers were permitted to conduct a more intrusive investigation (the pat down, the identification check, and possibly, the initiation of a search of the car). *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Delaware v. Prouse,* 440 U.S. 648, 648 (1979) (absent reasonable suspicion, "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile" violates the Fourth Amendment.)

### 6. *The Search of the Volkswagen*

The officers searched the Volkswagen and found nothing. [39] ¶ 28; [31-4] at 33:14–17; [31-3] at 21:13–16. Absent prior consent (or probable cause, not argued here), there is a genuine dispute as to whether the search was reasonable.

---

[4] Defendants point out that the encounter was limited in duration, [37] ¶ 25 (the officers say the entire encounter took between five and ten minutes long), and argue that, as a result, less suspicion was required. *See United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006). While this may be true generally, it does not change the undisputed facts that support a finding of seizure, nor the legal precedent that requires adequate justification for that seizure and the search that followed. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 20 (1968).

Consent often but not always renders a warrantless search reasonable. *See United States v. Mosby*, 541 F.3d 764, 767 (7th Cir. 2008). The person who provides consent must have "apparent authority" over the thing to be searched. *Id*. An individual has "apparent authority" when it "would appear to a reasonable person, given the information that law enforcement possessed," that the individual had "common authority over the property." *United States v. James*, 571 F.3d 707, 714 (7th Cir. 2009).

Consent can be implied. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016) ("sometimes consent to a search need not be express but may be fairly inferred from context"). "Gestures are often ambiguous," but when taken in combination with other indications of consent (e.g., verbal consent), they can provide officers with the authority needed to conduct a search. *United States v. Raibley*, 243 F.3d 1069, 1076 (7th Cir. 2001) (declining to decide whether gestures can ever, on their own, amount to consent).

There is a material dispute over consent. Taking the facts in the light most favorable to the plaintiffs, neither of the young men gave any verbal indication of consent at all. [37] ¶ 22; [31-4] at 57:16–58:8. The passenger's statement to "go ahead" is not enough to find consent as a matter of law. The defendants have presented no facts tending to support an inference that the minor passenger had authority over the Volkswagen. Passengers do not usually have authority over the cars they ride in; they lack physical control, for one, and for another, they lack control over the keys, which are used to allow access to a third party. *See United*

*States v. Groves,* 530 F.3d 506, 509 (7th Cir. 2008). By the time the officers searched the car, they had already obtained and reviewed both the driver's license and the passenger's student identification (which the passenger provided because he did not have a driver's license). [34-1] at 47:3–5. A reasonable officer, finding a fifteen-year old in the passenger's seat without a driver's license or keys, would not conclude that the fifteen-year-old had apparent authority over the Volkswagen.

Any consent from the driver is disputed. If he consented, he consented by gesturing to assist Officer Miller after the search had begun, and there remains a genuine issue as to whether the initial portion of the search was justified. Beyond that, the testimony about the driver's conduct was equivocal. According to the driver, the driver intuited that assistance would be needed and provided it. *See* [31-2] at 57:2–14. To the degree he communicated assent to the search, he did so mostly through actions (plus, one question that suggested the intent behind those actions: "Would you like me to help you with that?"). [31-3] at 57:1–2; [31-1] at 55:23–56:2. That is not enough to decide that, as a matter law, the driver consented to the search, *Raibley*, 243 F.3d at 1076, and as a result, there remains a genuine issue as to whether what the driver did and said together amount to a clear indication of consent to search.

### B. State Law False Arrest

Under Illinois law, "false arrest is the unlawful restraint of an individual's personal liberty." *Meerbrey v. Marshall Field & Co.* 189 Ill.App.3d 1085, 1090 (1st Dist. 1989). "The essential elements of a cause of action for false arrest or false

17

imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 474 (1990). "The standard for arrest is whether a reasonable person in the plaintiff's place, innocent of any crime, would think that he or she was free to leave." *Carey v. K-Way, Inc.*, 312 Ill.App.3d 666, 670 (1st Dist. 2000).

"[W]here an officer makes an arrest without a warrant for an alleged crime which has not been committed in his presence, such arrest is illegal if the crime has not actually been committed." *McKendree v. Christy*, 29 Ill.App.2d 195, 199 (3rd Dist. 1961). Alternatively, "a plaintiff has to show that she was unreasonably restrained without probable cause." *Ross v. Mauro Chevrolet*, 369 Ill.App.3d 794, 798 (1st Dist. 2006). *See also Hvorcik v. Sheahan,* 847 F. Supp. 1414, 1425 (N.D. Ill. 1994) (a plaintiff in a false imprisonment action must show that the restraint was "either unreasonable or without probable cause"). Under Illinois law, "[p]robable cause is defined as a state of facts which, if known, would lead a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." *Lappin v. Costello*, 232 Ill.App.3d 1033, 1042 (4th Dist. 1992); *Cross v. City of Chicago*, 4 F.3d 996 (7th Cir. 1993). "While the mere suspicion that an offense is being committed is not sufficient, evidence sufficient to convict is not required." *People v. Sauer*, 177 Ill.App.3d 870, 879 (2nd Dist. 1988).

The plaintiffs were "restrained" when the officers parked their Crown Victoria behind the Volkswagen, preventing their departure. The standard for

18

restraint under Illinois law includes the same standard for a violation of the Fourth Amendment under federal law: whether a reasonable person would have felt free to leave.

The second element also parrots the prohibition against constitutional violations from the Fourth Amendment: if there was restraint, there must have been probable cause. As discussed above, there remains a genuine dispute of material fact as to whether the officers possessed facts that would support a reasonable, articulable suspicion that a crime was taking (or had just taken) place—let alone facts which, "if known, would lead a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." *Lappin v. Costello*, 232 Ill.App.3d 1033, 1042 (4th Dist. 1992). And in any event, even if the officers had reasonable suspicion, there remains a genuine dispute as to whether any crime was committed. *Christy*, 29 Ill.App.2d at 199. As a result, summary judgment on the state-law false arrest claim is inappropriate.

## IV. Conclusion

Defendant's motion for summary judgment [29] is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: October 15, 2018